Fremont-Smith, Thayer, J.
The plaintiff, Marguerite Rafuse (“Rafuse”), as administratrix of the estate of her daughter, Linda Goudey (“Goudey”), brings a fraudulent conveyance action against Michal Stryker (“Mrs. Stryker”) and her daughters Deane Stryker, Taomi Stryker, and Teva Stryker (collectively, “the defendants") to satisfy a judgment against Mrs. Stryker’s husband, Timothy Stryker (“Mr. Stryker”), in a wrongful death case involving Goudey.[3] Rafuse’s amended complaint alleges fraudulent conveyance against all defendants (Count I), civil conspiracy against Mrs. Stryker (Count II), and fraudulent conveyance against Mrs. Stryker (Count III). Before the court are the parties’ cross motions for summary judgment pursuant to Mass.R.Civ.P. 56(c) on all counts of the amended complaint. For the reasons explained below, the defendants’ motion for summary judgment is ALLOWED in part and DENIED in part, and Rafuse’s motion for summary judgment is DENIED.
BACKGROUND
On September 27, 1996, Rafuse brought a wrongful death action against Mr. Stryker alleging that he strangled Goudey to death in 1993. The jury returned a $15 million verdict against Mr. Stryker on June 16, 2006. Rafuse alleges that while the wrongful death action was pending, Mr. Stryker made several fraudulent transfers to his wife and children in violation of the Uniform Fraudulent Transfers Act (“UFTA”), G.L.c. 109, §6.
On April 29, 1995, Mr. Stryker married Mrs. Stry-ker. They lived in a two-bedroom condominium when they were first married. By early 2000, the Strykers had two young daughters and were expecting a third child and therefore made a decision to look for a larger house. On March 29, 2000, the Strykers purchased a home at 6 Wincrest Drive in Winchester, Massachusetts for $499,000 as tenants by the entirety. The $499,000 paid for the house was provided by Mr. Stryker from his earnings and savings. Mrs. Stryker was a stay-at-home mother caring for the family’s three young girls, Deane, Taomi, and Teva Stryker. On June 15, 2006, Mr. Styker recorded a homestead declaration in his name on 6 Wincrest Drive. On October 24, 2006, Rafuse recorded an attachment on 6 Wincrest Drive.
In 1998, while the wrongful death action was pending, Mr. Stryker opened a joint account with Mrs. Stryker at Brown & Co., which later became an E*Trade account (“joint account”). Mrs. Stryker did not contribute any funds to the joint account. On April 14, 2000, two accounts were opened at Fidelity Investments, Nos. 603-709581 and 603-709590, to start education funds for the Strykers’ daughters Taomi and Deane. The initial deposit into each of these accounts was $10,000.[4] On December 30, 2001, another account at Fidelity, no. 605-032514, was opened for the Strykers’ third daughter, Teva. The initial deposit into this account was $5,000 and was deposited on January 7, 2002. Mr. Stryker was named as the custodian of each of the Fidelity accounts, and each respective daughter was named as the beneficiary.[5] On March 12, 2002, $9,456.41 was deposited into Fidelity account no. 603-709581 (Taomi’s account).
On June 30, 2006, Mr. Stryker withdrew $175,919.40 from the joint account. The money was deposited to Mrs. Stryker’s Bank of America account *96 on July3, 2006. On July 16, 2006, Mrs. Stryker wrote a check for one-half of the account, $87,959.50, to Mr. Stryker. Mr. Stryker then divided the $87,959.50 equally into the three accounts at Fidelity Investments that were previously set up as education funds for each of his three children.[6] The funds to the Fidelity accounts were deposited on July 24, 2006.
Rafuse also alleges that Mr. Stryker deposited money into a Vanguard account for Taomi, which was valued at $6,921.15 as of September 30, 2006. The defendants state that this account had a balance of $6,421.05 on December 31, 2005 and the records show that there were no deposits made from December 31, 2005 to September 30, 2006. Additionally, Rafuse alleges that Mr. Stryker funded a Vanguard Retirement account in Mrs. Stryker’s name, the balance of which was $13,272.81 as of September 30, 2006.
This Court has already encumbered all of Mr. Stryker’s existing assets which have been identified. Thus, on October 18,2006, another judge of this Court granted Rafuse an injunction in the wrongful death case,[7] prohibiting Mr. Stryker from transferring any of his assets without full consideration. On December 16,20001 enjoined Mr. Stryker in the 1996 action from receiving the $90,000 ball money which his counsel had retrieved from the criminal session of the Court. On April 21, 2009 I ordered that Mr. Stryker transfer that $90,000 to the attorney for Marguerite Rafuse, the plaintiff in this case.
Then, on May 12, 2009, I enjoined Mr. Stryker as follows:
PRELIMINARY INJUNCTION The defendant Timothy D. Stryker and anyone acting in his behalf, is prohibited from transferring or alienating: (1) real property the defendant owns in Fairfield, Iowa; and (2) Real Estate Investment Trusts (REITs) owned by the defendant. The defendant is also ordered, within 10 days, to disclose to plaintiffs counsel the name of the entity or entities which hold the REITs owned by the defendant.
On September 1, 2009 another judge of this Court ordered that
The defendant, Timothy D. Stryker, and anyone acting in his behalf, is prohibited from transferring or alienating (1) real property the defendant owns in Fairfield, Iowa; (2) Real Estate Investment Trusts (’REITs’) or other investments referred to on the document entitled ‘Statement of account for Tim Stryker as of 12/30/2008,’ attached to this Order. Any distributions or payments made in any form by any funds listed on the Statement of account for Tim Stryker as of 12/30/2008 shall be forwarded to an escrow account held by Attorney Michael L. Altman, pending further Order of the Court on September 11, 2009 at 2:00 p.m. in Courtroom 710.
On October 20, 2009 I ordered as follows:
ORDER FOR PARTIAL EXECUTION TO ISSUE. WHEREAS this Court entered an amended judgment in the amount of $22,139,569.32 against the Defendant Timothy Stryker on October 18, 2008, it is hereby ORDERED ‘that a partial execution for the following properties only shall issue forthwith: 1) The following real property located in Stoneham, Massachusetts: *106 Main Street, Stoneham, Massachusetts 02180 (Unit 1, Unit 2, & Unit 3) 2) The following property in Jefferson County, Iowa; *The property described as JANI WOOD SUB LOT 33 (2.79 acres of vacant real property) located in Fair-field, Iowa: Plot Number 06-09-301-003, Recording 218/187. 3) The following investment holding of Timothy Stryker acquired through the broker John Weiss, Crown Capital Security, St. Phillip’s Plaza, 4280 N. Campbell Ave., Tucson, AZ 85718: *NNN 2001 Value Fund, LLC (5 Units) *NNN T-Reit, Inc. (1000 Units) *Laeros 2002 Income Fund, LP (Unspecified number of Units) *NNN 2002 Value Fund, XIV, LLC (3 Units) *RK MultiFamily Income Fund XIV, LLC (4 Units) *G-REIT, INC. (2001 Units) *Dubose Model Home Inc. Fd #4 (.67 Units).
Then, on October 28, 2009 I ordered:
Execution for Possession issued as to Marguerite Rafuse, Adm. for 106 Main Street Stoneham, MA 02180 (Unit 1, 2, and 3); and the following property in Jefferson County, Iowa the property described as JANI WOOD SUB LOT 33 (2.79 acres of vacant real property) located in Fairfield, Iowa. Plot Number 06-09-301-003, recording 218/187; the following investment holding of Timothy Stryker acquired through the broker John Weiss, Crown Capital Security, St. Phillip’s Plaza, 4280 N. Campbell Ave., Tucson, AZ 85718: NNN 2001 Value Fund, LLC (5 Units) NNN T-Reit, Inc. (1000 Units) Laeroc 2002 Income Fund, LP (unspecified number of Units) NNN 2002 Value Fund XIV, LLC (3 Units) RK MultiFamily Income Fund XIV, LLC (4 Units) G-REIT, Inc., (2001 Units) Dubose Model Home Inc., Fd #4 (.67 Units).
Now, in this 2009 action, Rafuse seeks to divest Mrs. Stryker and her children of property standing in their respective names.
DISCUSSION
I. Legal Standard
Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the record entitles it to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Aparty who does not bear the burden of proof at trial may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by *97 demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Commc’ns. Corp., 410 Mass. 805, 809 (1991). Once the moving party “establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact.” Pederson, 404 Mass, at 17. The court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. See Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982).
II. Count I — Fraudulent Conveyance of Mr. Stryker’s Assets
Rafuse asserts that the transfers of Mr. Stryker’s money, detailed above, into his wife’s and children’s accounts were fraudulent transfers as defined by §6(a) of G.L.c. 109A, the Uniform Fraudulent Transfers Act (“UFTA”).[8] In general, the UFTA provides a procedure by which a creditor can seek to have a court void the fraudulent transfer of assets by a debtor in certain circumstances. Section 6 of the UFTA describes one type of fraudulent transfer that applies when a creditor’s claim arose before a transfer was made:
A transfer made ... by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made ... if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
G.L.c. 109A, §6(a). The UFTA defines a claim as, “a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.” G.L.c. 109A, §2. Debt is defined by the statute as liability on a claim. Id. The statute then defines insolvency. G.L.c. 109A, §3. A debtor is insolvent if the sum of his debts is greater than all of his assets, at a fair valuation. Id. A person not able to pay his debts as they become due is presumed to be insolvent. Id.
Rafuse argues that under the UFTA, Mr. Stryker was a debtor and she was a creditor at the time of each transfer, Mr. Stryker did not receive a reasonable equivalent value in exchange for the transfers, and at the time of the transfers Mr. Stryker was insolvent. Therefore, Rafuse alleges that each transfer was fraudulent and should be set aside. Rafuse alleges that the following transactions constitute fraudulent transfers under the UFTA:
(1) $87,959.50 of the $175,919.40 in the joint account deposited into Mrs. Stryker’s Bank of America account on July 3, 2006;
(2) $29,286.34 deposited by Mr. Stryker into Fidelity account No. 603-709581 (Taomi Stryker) on July 24, 2006;
(3) $29,286.33 deposited by Mr. Stryker into Fidelity account No. 603-709590 (Deane Stryker) on July 24, 2006;
(4) $29,286.33 deposited by Mr. Stryker into Fidelity account No. 605-032514 (Teva Stryker) on July 24,2006;
(5) Earlier deposits into the Fidelity accounts:
a. The $10,000 initial deposit into Fidelity account No. 603-709581 (Taomi Stryker) on April 14, 2000;
b. The $10,000 initial deposit into Fidelity account No. 603-709590 (Deane Stryker) on April 14, 2000;
c. The $5,000 initial deposit into Fidelity account No. 605-032514 (Teva Stryker) on January 7, 2002;
d. A $9,456.41 deposit into Fidelity account No. 603-709581 (Taomi Stryker) on March 2, 2002;
(6) The balance of a Taomi Stryker Vanguard Group account ($6,921.15 as of September 30, 2006, but no deposits after January 9, 2005); and
(7) The balance of a Mrs. Stryker Vanguard Retirement account ($13,272.81 as of September 30, 2006, but no deposits after January 9, 2005).
The defendants argue: (1) the transactions complained of were not “transfers” under the UFTA; (2) Rafuse cannot prove that Mr. Stryker was insolvent when he made the transfers; (3) Mr. Stryker did receive reasonably equivalent value in exchange for the transfers; and (4) Rafuse’s claims are barred by the statute of limitations.
A. “Statute of Limitations”
The UFTA that was adopted on October 8, 1996 includes a provision entitled, “Limitation Period for Bringing Cause of Action.” See G.L.c. 109A, §10. There was no similar section in the UFCA. Section 10 of the UFTA provides:
Section 10. A cause of action with respect to a fraudulent transfer or obligation under this chapter shall be extinguished unless action is brought
(a) under paragraph (1) of subsection (a) of section five, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;
(b) under paragraph (2) of subsection (a) of section five or subsection (a) of section six, within four years after the transfer was made or the obligation was incurred; or
(c) under subsection (b) of section six, within one year after the transfer was made or the obligation was incurred. (Emphasis added.)
In her memoranda, Rafuse argues that the transfers by Mr. Stryker were in violation of §6 (a) of the UFTA. Section 10(b) states that a cause of action brought *98 pursuant to §6(a) shall be extinguished unless an action is brought within four years after the transfer was made. Rafuse contends that this case should not be governed by any specific year limit because the discovery rule applies. Under the discovery rule, applicable to a statute of limitations (as opposed to a statute of repose) a claim is tolled until the plaintiff has knowledge or sufficient notice that she was harmed and of what the cause of harm was. Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 228 (2009). While § 10(b) appears on its face to be a statute of repose, Rafuse relies on §11 of the UFTA to support her argument. Section 11 states:
Unless otherwise required by the provisions of this chapter, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, shall supplement its provisions.
Rafuse states that she could not have discovered the alleged fraudulent transfers prior to the verdict on June 16, 2006, and therefore the statutory period for filing was tolled until at least June 16, 2006. This argument is unpersuasive.
Section 10(b) of the UFTA, however, states that a cause of action “shall be extinguished unless the action is brought” within the prescribed period. These words relate to the substance of the right and not merely the remedy. It is therefore a statute of repose rather than of limitations. In re Mi-Lor Corp., 233 B.R. 608, 616 (Bkrtcy.D.Mass. 1999) (discussing G.L.c. 109A, §10); see also In re Granderson, 214 B.R. 671, 675-76 (Bkrtcy.D.Mass. 1997) (same), and cases cited. “A statute of limitations normally governs the time within which legal proceedings must be commenced after the cause of action accrues ... A statute of repose, however, limits the time within which an action may be brought and is not related to the accrual of any cause of action. The injury need not have occurred, much less have been discovered.” In re Mi-Lor Corp., 233 B.R. at 616, quoting Klein v. Catalano, 386 Mass. 701, 702 (1982) (internal citations omitted). Because the running of a statute of repose does not depend upon accrual of the plaintiffs cause of action, it is immaterial when the plaintiff acquired knowledge of facts which inform her, or which should inform her, of the existence of a cause of action. Id. at 617.
Section 10(b) thus operates without regard to a plaintiffs knowledge and the resulting accrual of her cause of action. Id. “This is its clear implication in light of subsection (a), which sets the bar at the later of four years after the transaction complained of or one year after the transaction ‘was or could reasonably have been discovered by the claimant.’ ” Id. This interpretation is confirmed by the official UFTA comment, which states: “Its purpose is to make clear that lapse of the statutory periods prescribed by the section bars the right and not merely the remedy.” Comment, UFTA §9.
Rafuse filed her original Complaint against the defendants on January 9, 2009. Therefore, only transfers under G.L.c. 109A, §6(a) made on or after January 9, 2005 survive the UFTA’s limitations period. See G.L.c. 109A, § 10(b). The claims relating to all of the initial transfers into the daughters’ Fidelity accounts, the $9,456.41 deposit in Fidelity account No. 603-709581 (Taomi Stryker) on March 2, 2002, the balance ofTaomi Stryker’s Vanguard Group account, and the balance of Mrs. Stryker’s Vanguard Retirement account are thus extinguished by the four-year limitation period. The transfer from the joint account into Mrs. Stryker’s Bank of America account and the deposits into the three Fidelity accounts on July 24, 2006 survive.
Even if Rafuse could avail herself of an extra year from when she discovered or reasonable could have discovered the transfers by categorizing her claims as under G.L.c. 109A, §5(a), her claims would still be barred by the statute of limitations. The jury rendered its verdictagainstMr. Stryker on June 16,2006. Thus, on that date liability had been established and Rafuse could have promptly conducted an investigation into Mr. Stryker’s assets. Rafuse, through her counsel, did take the deposition of Mr. Stryker on March 28, 2007, the purpose of which was to discover his assets. Therefore, Rafuse knew or should have known of the transfers at least by March 28, 2007 and would have had at most until March 28, 2008 to file suit, but did not do so until January 9, 2009.
B. Transactions Were “Transfers” under the UTCA
With regard to the surviving claims, Section 2 of UFTA broadly defines a “transfer” to include “every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.” This broad definition encompasses Mr. Stryker’s withdrawal of all of the funds in the joint account. When he took “his half,” divided it into three equal portions and deposited the portions in each of his daughters’ Fidelity accounts, he parted with an asset or an interest in an asset.
Whether Mrs. Stryker is legally entitled to half of the joint account which Mr. Stryker deposited into Mrs. Stryker’s Bank of America account on July 3, 2006, is more complicated and a question of fact. A party to a Massachusetts joint bank account has the right to withdraw all the funds in a joint account, or any portion of them. Heffernan v. Wollaston Credit Union, 30 Mass.App.Ct. 171, 177 (1991). Unlike ajoint tenant of property held in a traditional joint tenancy, one party may effectively exercise control over the entire interest, or any part of it, and divest, totally or *99 partially, the interest of the other. Id., citingG.L.c. 171, § 10. The legal form of a joint account is not conclusive between the parties as to its ownership. Id., at 177 fn. 7. The real interest of each joint depositor may be determined in an action in equity. Id., citing Blanchette v. Blanchette, 362 Mass. 518, 523-24 (1972). The authority of Mr. Stryker or Mrs. Stryker to withdraw the whole or any part of the joint account or any other restriction is often found on the deposit agreement. Sawyer v. National Shawmut Bank, 306 Mass. 313, 315-16 (1940). A deposit agreement signed by the depositors to a joint account “constitute(s) a contract between them and the bank and establishe(s) their rights in relation to the bank, irrespective of . . . whatever rights . . . they might have had between themselves.” Id. A material issue of fact thus remains as to the extent of Mrs. Stryker’s existing interest in the joint account when a half of it was deposited in her individual account. “The determination of the interest [Mr. and Mrs. Stryker] had in the deposits in the joint accounts is dependent primarily on what their intention was, and this is a question of fact.” Buckley v. Buckley, 301 Mass. 530, 531 (1938). See also Campagna v. Campagna, 337 Mass. 599, 604 (1958); Milan v. Boucher, 285 Mass. 590, 594 (1934).
C. Insolvency and Reasonably Equivalent Consideration Are Factual Questions
Rafuse argues that Mr. Stryker was insolvent when he made all of the surviving transfers and did not receive a reasonably equivalent value in exchange for the transfers. Rafuse carries the burden of proving both that the transfers lacked fair consideration and that Mr. Stryker was insolvent at the time or became insolvent because of the transfers. Eliot Discount Corp. v. Dame, 19 Mass.App.Ct. 280, 282-83 (1985).
The UFTA defines solvency as: “[a] debtor is insolvent if the sum of his debts is greater than all of his assets, at a fair valuation.” G.L.c. 109A, §3. “Debt” is defined by the statute as “liability on a claim.” G.L.c. 109A, §2. The definitions of insolvency and debt under the UFTA are substantially different from the definitions of insolvency and debt under the UFCA. Insolvency under the UFCA was defined as, “when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and mature.” (Emphasis added.) Debt was defined under the UFCA as “any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.” The new definition of insolvency does not include probable liability on existing debts, and the new definition of debt does not include unmatured or unliquidated claims. These differences are significant and must be taken into account when examining cases where the UFCA was the applicable law.
Mr. Stryker’s liability on the wrongful death claim was not established until June of 2006, when the juiy returned a verdict against Mr. Stryker. Rafuse cites to Innis v. Robertson, 67 Mass.App.Ct. 388, 393 (2006), to support her argument that the judgment against Mr. Stryker should be counted as debt when he made the transfers. The court in Innis counted a judgment against the defendant that had not yet been established when the transfers occurred, as a debt when calculating his insolvency. 67 Mass.App.Ct. at 393. The court stated, “One need not have obtained a judgment in order to qualify as a creditor for fraudulent conveyance purposes.” This case is not persuasive here since the UFCA was the applicable law and spoke in terms of creditor status. A determination of insolvency, moreover, requires a factual determination of Mr. Stryker’s assets and his debts at the time of the transfers, and the record here is devoid of undisputed facts to enable the Court to make such a determination.[9]
Similarly, whether Mr. Stryker received reasonably equivalent value in exchange for the transfers is a factual question. A conveyance made on the meritorious consideration of blood or affection to a child, or as a settlement to a wife, is not, as matter of law, fraudulent and void as to existing creditors. Cook v. Holbrook, 146 Mass. 66, 67 (1888). Whether equivalent value is received for the transfer depends upon all the circumstances of the transaction. Id. It appears that Mrs. Stryker did provide some consideration, as she substantially contributed to the family by caring for the children full-time and maintaining the household. To hold otherwise would be to deny the economic value of child rearing services. This issue may become moot as to the $87,959.50 of the $175,919.40 in the joint account deposited into Mrs. Stryker’s Bank of America account on July 3, 2006 if Mrs. Stryker can establish at trial that she was already legally entitled to half of the joint account.
III. Count II — Civil Conspiracy
To establish civil conspiracy, Rafuse must demonstrate that the Strykers “manifest[ed] a common plan to commit a tortious act where the participants know of the plan and its purpose and [took] affirmative steps to encourage the achievement of the result.” Kurker v. Hill, 44 Mass.App.Ct. 184, 189 (1998) (internal citation omitted). Key to this cause of action is a defendant’s substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan. Id. Even if there were no disputed issues of fact as to whether some of the transfers were fraudulent because they lacked fair consideration and as to whether Mr. Stryker was insolvent at the time or became insolvent because of the transfers, no undisputed evidence has been provided that Mrs. Stryker took any affirmative steps to encourage the achievement of a tortious act. See Stock v. Fife, 13 Mass.App.Ct. 75, 82 n. 10 (1982) (despite a common plan among friends to drink alcohol while driving to and from a nightclub, no joint liability from the mere *100 presence of the defendant in the car when the driver ran a red light and struck another vehicle); Kyte v. Philip Morris, Inc., 408 Mass. 162, 167-68 (1990) (no proof that the defendant cigarette manufacturer gave substantial assistance to a store’s sale of cigarettes to minors or knew that the store’s conduct constituted a breach of duly to minors purchasing cigarettes). That Mrs. Stiyker admittedly participated in a “joint decision” to transfer the money from the joint account to her childrens’ college accounts is evidence that indicates a common plan, but does not indicate that Mrs. Stryker gave substantial assistance to a tortious act.[10]
IV. Count III — Fraudulent Conveyance of the Home at 6 Wincrest Drive
Rafuse also alleges that the purchase of the Strykers’ home at 6 Wincrest Drive with Mr. Stiyker’s earnings and savings and placing that home in both of their names as tenants by the entirety constituted a fraudulent conveyance under the UFTA. Based on the statute of limitations analysis infra, this claim is extinguished by the four-year statute of repose. Since the house was purchased in 2000, Rafuse had to bring her claim within four years of the transfer, or by 2004.
Furthermore, the home is protected by the Homestead Declaration. Massachusetts courts have stated that homestead exemptions should be liberally construed in favor of debtors. See Dwyer v. Cempellin, 424 Mass. 26, 29 (1996). “Homestead laws are based on a public policy which recognizes the value of securing to householders a home for the family regardless of the householder’s financial condition.” Id. Similarly, the United Bankruptcy Court has recognized that the declaration of a homestead on real property is not a transfer under UFTA. See In re Lyons, 355 B.R. 387, 390 (Bankr.D.Mass. 2006); see also In re Miller, 113 B.R. 98, 104 (Bankr.D.Mass. 1990) (‘The veiy purpose of the homestead law is to put the homestead beyond the reach of creditors . . . The debtor can hardly be faulted for having done what the law permits him to do”). It is immaterial that Mr. Stiyker chose to record the homestead exemption one day before Rafuse obtained her judgment on the wrongful death claim. See In re Feiner, 2005 Bankr. LEXIS 2509, *7-8 (March 7, 2005) (finding homestead declaration valid even if recorded on eve of bankruptcy). Thus, Mr. Stiyker’s homestead exemption is valid to the extent of $500,000. Even though the present value of the Winchester home is $700,000, Mrs. Stiyker’s interest in the remaining $200,000 cannot be subject to seizure or execution by a creditor of Mr. Stiyker. See G.L.c. 209, §1. General laws chapter 209, Section 1 provides in part, “(t]he interest of a debtor spouse in property held as tenants by the entirety shall not be subject to seizure or execution by a creditor of such debtor spouse so long as such property is the principal residence of the nondebtor spouse.” Summary judgment for the defendants is thus appropriate on this count.
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiffs motion for summary judgment be DENIED and the defendants’ motion for summary judgment be ALLOWED as to Count II (civil conspiracy), Count III (fraudulent conveyance of the marital home), and the following claims under Count 1:
(1) The $10,000 initial deposit into Fidelity account No. 603-709581 (Taomi Stiyker) on April 14, 2000;
(2) The $10,000 initial deposit into Fidelity account No. 603-709590 (Deane Stiyker) on April 14, 2000;
(3) The $5,000 initial deposit into Fidelity account No. 605-032514 (Teva Stryker) on January 7, 2002;
(4) $9,456.41 deposit into Fidelity account No. 603-709581 (Taomi Stiyker) on March 2, 2002;
(5) The balance of a Taomi Stiyker Vanguard Group account ($6,921.15 as of September 30, 2006), but not as to any deposits after January 9, 2005); and
(6) The balance of a Mrs. Stryker Vanguard Retirement account ($13,272.81 as of September 30, 2006), but not as to any deposits after January 9, 2005).
The defendants’ motion for summary judgment is DENIED as to the $87,959.50 from the joint account deposited into Mrs. Stryker’s Bank of America account, and the three deposits into the childrens’ Fidelity college accounts on July 24, 2006, and any deposits made by Mr. Stiyker to Mrs. Stiyker’s Vanguard accounts after Januaiy 9, 2005.

 Mr. Stryker’s liability on the judgment with interest is now $22,139,569.

 The defendants contend that Mrs. Stryker’s father gave each granddaughter a gift of $ 10,000 around the time of their births, and the $10,000 that was used to open each Fidelity account was the gift from Mrs. Stryker’s father.

 The court has since allowed the substitution of Mrs. Stiyker as custodian of the Fidelity accounts.

 $29,286.34 was transferred to Fidelity account No. 603-709581 (Taomi Stiyker), $29,286.33 was transferred to Fidelity account No. 603-709590 (Deane Stiyker), and $29,286.33 was transferred to Fidelity account No. 605-032514 (Teva Stiyker).

 Rafuse, Adm. v. Stryker, MICV 1996-05735.

 The UFTA replaced the Uniform Fraudulent Conveyances Act (“UFCA”) in 1996. The UFTA is applicable to all transfers made after October 8, 1996. Federal Sav. & Loan Assn. of Gallon, Ohio v. Napoleon, 428 Mass. 371, 373 (1998).

 The parties did not submit any balance sheet or other evidence detailing Mr. Stiyker’s assets and debts at the time of the transfers.

 Her affidavit indicates she was advised by counsel that the transfers were legal and that she believed them to be.